NORA GUNNOE, *Admx. v.* WEST VIRGINIA POULTRY CO-OPERATIVE ASSOCIATION, *et al.*

(No. 7841)

Submitted April 25, 1934.     Decided May 22, 1934.

*McGinnis, Ashworth & Mann,* for plaintiffs in error.
*E. W. Worrell* and *Carl C. Sanders* and *File, Goldsmith & Scherer,* for defendant in error.

88

Nora Gunnoe, administratrix of the estate of Rush Gunnoe, a thirteen year old boy, brought this action of trespass on the case for death by wrongful act in the circuit court of Raleigh County against Samuel D. Erdlen and West Virginia Poultry Co-Operative Association, a corporation. Judgment was rendered upon a verdict of the jury finding for the plaintiff against both defendants in the sum of $5,000.00, and from that judgment, this writ of error is prosecuted.

Plaintiff's decedent met his death on the 18th day of November, 1932, at Bolt in Raleigh County, by being run over by a passenger automobile driven by Samuel D. Erdlen. The day was fair and the accident occurred at a little after three o'clock in the afternoon. There were no other vehicles traveling the road at the point of the accident. Erdlen was traveling from Glen Rogers towards Bolt, Lester and Beckley. From Bolt toward Glen Rogers, the road is straight for a distance of 600 or 700 feet and beyond Bolt toward Beckley, it continues straight for 200 or 300 feet further. The pavement is sixteen feet wide, and at the point of accident at Bolt, there are broad and flat shoulders for a distance of eight or ten feet on each side of the pavement. Approaching Bolt from Glen Rogers, on the right is Farmer's store and on the left almost exactly opposite is a filling station also operated by the Farmers. A Chevrolet truck traveling toward Glen Rogers had drawn up at the filling station to buy gas. In it were Alba Smith, driving, age seventeen, Clyde Clark and Edward Smith all of whom testified as witnesses for the plaintiff. Their narratives of the accident, while differing in some detail, are substantially the same. They say that Mrs. Farmer sold them the gasoline and upon returning to the store on the opposite side of the road from the filling station, gave four cents in change to the Gunnoe boy to be carried across the road to the truck, which was standing three or four feet off the hard surface of the road. The boy crossed the road bringing the money and handed it in at the window of the truck re-

maining in plain view of anyone traveling the road. After having handed the money in at the truck window, he took a step or two back across the road toward the store. At this moment, Alba Smith heard his brother shout "Watch that car, boy", and he reached for the boy, but failed to restrain him. The car driven by Erdlen was 85 or 100 feet from the truck when the boy handed the change in at the window and started back across the road, and was traveling between 35 and 40 miles an hour on the right side of the road. At the time the warning was shouted, the boy glanced up the road toward the car and started running slanting to the left across the road. He had gotten to within about one step of safety when the right side of Erdlen's car struck him, carried him about 25 feet, ran over him and stopped 30 or 40 feet beyond the point where the boy was picked up, making a total distance of between 55 and 65 feet that Erdlen's car traveled after having struck the boy. The boy died almost immediately. There is proof of the plaintiff to the effect that Erdlen did not sound a warning, did not slacken the speed of his automobile and did not swerve it in one direction or in the other in an effort to avoid striking the boy.

On the other hand, the defendant's testimony is to the effect that the boy passed behind the truck in delivering the change and went out of his view; that he did not see him again until he had gotten into the road and was running across directly in front of his car; that at the time he saw him first, he sounded his horn, applied his brakes and swerved to the right, all in an effort to avoid striking him. Erdlen testified that he was running between 20 and 25 miles an hour, and that at that speed he could stop in about 25 feet. He testified that he was within 20 or 25 feet of the boy when he appeared from behind the truck with his head down running toward the store.

Venue was laid in Raleigh County under Code, 56-1-2, giving the right to bring the action in the county wherein the cause of action arose, although none of the defendants are residents of that county, where one of the

defendants is a corporation. Erdlen interposed a timely plea in abatement to the jurisdiction of the court, alleging that he was and had always been a resident of Kanawha County, and that no relationship existed between him and the West Virginia Poultry Co-Operative Association which would give the plaintiff a cause of action against the company, averring that he was not its servant, agent or employee in any manner that would make it liable for the supposed right of action alleged in the plaintiff's declaration, and that he had been served in Kanawha County. To this plea in abatement, the plaintiff filed her replication in writing denying the averments of the plea, except as to service, and reiterating its allegation of liability as against the corporation. The issue thus joined was tried before a jury and the jury returned its verdict deciding that issue against the contention of the defendant Erdlen.

On the hearing on the plea · in abatement, E. S. Humphrey, president of the West Virginia Poultry Co-Operative Association, testified that Erdlen was not employed by that company during the month of the accident; that the custom was for Erdlen to take orders during the week based on prices quoted to him by the company for delivery of goods at Charleston, send those orders to the company at its Parkersburg headquarters, and that the goods ordered were subsequently delivered by truck to Erdlen at Charleston. He testified that the company had no "jurisdiction" over the goods thereafter; that the company kept a payroll but that it paid Erdlen no salary, and that his name did not appear upon the payroll; that the company paid no part of his expenses, did not furnish him an automobile, gave him no directions where to go and when, and did not control the method and manner of his sales, or his selling price; that Erdlen's profit consisted in whatever he was able to procure for the goods over and above the price that he paid the West Virginia Poultry Co-Operative Association; that the company passed on the credit, and if the credit was not approved, Erdlen was expected to be responsible for the order; that Erdlen sent the company the full remittance

for the selling price and the company deducted the amount due it for the goods each week, remitting the balance to Erdlen; that the relationship could be terminated at any time by either party to it.

Erdlen, himself, testified that he bought eggs and poultry from the company and sold them on the open market; that he sold eggs and poultry for them on the 18th day of November, the day of the accident; that he sold other things for other persons, among them, potatoes for a Mrs. Poteet and syrup for a farm bureau organization; that he paid his own expenses, hotel bills, and the transportation charges for what he sold; that nobody told him nor directed him where to sell, how to work his trade, or how to travel, and that he was employed by no one; that where he gave credit, the full amount was paid to the company because he could not carry the account, and that if the accounts were delinquent, he was obliged to take that responsibility; that he sold six or eight different products and could quit selling any one of them at any time he chose; that he has no written agreement with the West Virginia Poultry Co-Operative Association; that he carried two or three business cards, of which a card given to Mr. Farmer on the day of the accident, bearing the name of the West Virginia Poultry Co-Operative Association and his own name, was one; that at the time of the accident he was driving his own car, all of the upkeep and expenses of which he paid himself.

J. W. F. Beckner, manager of the Black Knight Country Club, testified that Erdlen habitually visited the club as salesman and sold to it poultry and eggs for the comany; that he gave Erdlen the orders and Erdlen gave back duplicates, and that the goods were invoiced from the company and the accounts paid at Parkersburg each month; that he never paid Erdlen anything; that he didn't remember whether Erdlen signed the orders; that they were delivered by ordinary open-top trucks without a name; that so far as he knows, Erdlen came to the club on his own account.

Robert H. Gunnoe testified that he saw Erdlen at Bolt

on November 18th, and that he said he was working for the West Virginia Poultry Co-Operative Association; that on the same day he delivered its card to Mr. Farmer; that Erdlen did not say who employed him, and was anxious to leave at the time, saying that he made his rounds every Thursday and could be seen at any time.

Fred Manning testified that he lived at Glen Rogers and worked in a meat shop; that Erdlen had frequently called there selling eggs and chickens, making the statement that he was soliciting business for the West Virginia Poultry Co-Operative Association; that the invoices for the goods came from Parkersburg; that he never paid Erdlen anything; that in addition to poultry and eggs, Erdlen had a line of maple syrup and perhaps something else at the same time.

In rebuttal, Erdlen testified that he did not make the statement to Gunnoe on November 18th that he was working for the company; but that he did give the card in question to Mr. Farmer.

Subject to certain rare exceptions, with which we do not believe we are here concerned, the test of the relationship of master and servant is the right of control of the master over the movements and conduct of the servant. *Greaser* v. *Oil Co.*, 109 W. Va. 396, 398, 155 S. E. 170; *Tompkins* v. *Ins. Co.*, 53 W. Va. 479, 492, 44 S. E. 439, 62 L. R. A. 489, 97 Am. St. Rep. 1006; 18 R. C. L. 782. Viewed in the light of this test, the question is: Does the proof upon which the issue on the plea in abatement was decided, constitute, as a matter of law, a sufficient showing that the relationship of master and servant existed between Erdlen and the West Virginia Poultry Co-Operative Association to justify the submission of that question to a jury? We believe that we have exhaustively recited the substance of this proof. From it, it would appear that the only control the company could possibly exercise over the conduct of Erdlen would be that which it might apply by threatening to terminate the relationship between them. This, however, does not answer the rule, because, under the rule, the control must grow out of the contract of employment, and not merely from the threat of terminating the rela-

tionship. All of the circumstances proved on the trial of the plea were in harmony with sworn statements of Erdlen and Humphrey to the effect that the company exercised no control over Erdlen. It did not carry him on its payroll, and it paid him nothing. It supplied no part of his expenses and neither routed nor controlled his goings and comings. His methods of sale and selection of customers were his own. He worked when he pleased and quit when he wanted to. He represented other persons who would be just as liable for his torts as would be the company joined as his co-defendant. Under the state of facts as disclosed by this record, we believe that the court, on the issue joined under the plea in abatement, should have directed the jury to find for the defendant.

The question is urged that inasmuch as the plaintiff acted in good faith in joining the West Virginia Poultry Co-Operative Association, and inasmuch as it had reasonable grounds to believe that liability existed on its part, that its joinder is proper and gives venue as to Erdlen, even though no cause of action may exist as against the corporation. There is substantial authority to this effect. At the same time, we are of the opinion that the more distinct and better rule, and that probably having the weight of authority behind it, is to the effect that venue depends upon the actual existence of the cause of action, and not upon the mere *bona fides* of the plaintiff in making his selection of defendants. We believe that making the matter of venue depend upon the good faith of the plaintiff based upon a reasonable belief in liability, although we recognize the plausibility of a great deal that can be said in favor of it, would involve the question in uncertainties and speculations that are highly undesirable in dealing with a question so fundamental.

To hold that defendants who have appeared and defended on the merits, even though they have in timely fashion saved the question of jurisdiction, should be dismissed at the end of a trial where a cause of action may have been proven as to them, but not as to the defendant

whose presence in the suit is necessary to venue, may seem highly technical. However, it seems less logical to say that venue can be based on the joinder of a defendant who is found to be wrongfully sued. These are the two extremes with which the courts have struggled, and which have led to pronounced divergence of views in the decided cases. In Kentucky and Illinois, the rules seem to depend upon express statutory provisions. *Martin v. Franklin,* (Ky.) 169 S. W. 540; *Williams v. Morris,* (Ill.) 86 N. E. 729, 731.

The following cases adhere to what may be called the rule of "good faith": *Hawkins* v. *Brown,* (Kan.) 97 Pac. 479; *Toland* v. *Sutherlin,* (Tex.) 110 S. W. 487; *January* v. *Rice,* 33 Mo. 409; *Remington Sewing Machine Co.* v. *Cole,* 62 Cal. 311; *Coal Company* v. *Farrabee, Admx.,* 79 Ind. App. 210, 137 N. E. 680, and *Bailey* v. *Chilton,* (Neb.) 184 N. W. 939. On the other hand, the following cases hold that venue depends upon the actual existence of the cause of action against the parties necessary to confer that venue: *Hamilton* v. *Du Pre,* (Ga.) 35 S. E. 684; *Dunn* v. *Hazlett,* 4 Ohio 435; *Tate and Thompson* v. *Blakely,* (S. C.) 3 Hill 297; *Warren* v. *Rushing,* (Ga.) 87 S. E. 775; *Edwards* v. *Buchanan,* (Tex.) 36 S. W. 1022; *Gorey* v. *Black,* 100 Ohio St. Rep. 73; *Fisher* v. *Fiske,* (Okla.) 219 Pac. 683; *Mills* v. *Daubenheyer,* (Okla.) 222 Pac. 523; *City of Sumter* v. *United States Fidelity and Guaranty Co.,* (S. C.) 106 S. E. 778; *Peters* v. *Pothast,* (Neb.) 231 N. W. 805, and *Hood* v. *Askey,* (Tex. Civ. App.) 270 S. W. 1047. It will be observed that the Texas courts do not agree as to the correct rule, and that the Nebraska court, after indicating the opposite view, has come to the rule based on the existence of the cause of action as to defendants conferring venue.

Having thus disposed of the matter of the plea in abatement, it becomes unnecessary to discuss the case on its merits and decide the other assignments of error.

The judgment of the circuit court of Raleigh County will be reversed, both the general and special verdicts

will be set aside, and the case remanded for further proceedings in accordance herewith.

*Reversed and remanded.*