MARY F. CRAFT, *Admx., etc. v.* THE POCAHONTAS
CORPORATION

(No. 8468)

Submitted February 24, 1937. Decided March 23, 1937.

*Lilly & Lilly,* for plaintiff in error.

*Richardson & Kemper* and *Paul S. Hudgins,* for defendant in error.

KENNA, PRESIDENT:

This is an action for death by wrongful act tried in the Circuit Court of McDowell County. A verdict for $3,-000.00 was returned, which, on motion, the trial court

set aside. Thereupon, the plaintiff asked leave to amend her writ and declaration so as to lay damages at $10,000.-00 instead of $3,000.00, the amount for which the action had originally been brought. This was refused, and the plaintiff below prosecutes this writ of error, assigning as grounds for reversal the action of the trial court in setting aside the verdict for $3,000.00, and the action of the trial court in thereafter refusing the motion to amend the writ and declaration.

The first assignment of error hinges almost entirely upon the sufficiency of the evidence to make out a case of negligence against the Pocahontas Corporation. This assignment sub-divides itself into proposition (a) that no negligence whatever is shown by the proof, and proposition (b) that in the event it should be thought that the proof establishes negligence on the part of someone, that such negligence was not the negligence of the Pocahontas Corporation.

The first question to be dealt with is whether the proof shows negligence that caused the death of the plaintiff's decedent. Of course, in the light of the verdict favorable to her contention, we view the facts most favorably to the plaintiff, and they will be stated in that manner.

Plaintiff's decedent came to his death sometime after dark on the evening of March 4, 1934, by coming in contact with a transmission line carrying 2300 volts of electricity. A rather full statement from the plaintiff's standpoint of the circumstances surrounding the fatal accident is necessary in order to understand the theory of recovery upon which recovery was sought.

The defendant, Pocahontas Corporation, conducts a coal operation at Bishop, Virginia, 3.9 miles distant from Squire in McDowell County. Power for the operation at Bishop and for both towns, as well as for a few individual consumers residing between the two towns, is supplied by the Appalachian Electric Power Company which brings over its transmission lines 88,000 volts to Faraday where that voltage is "stepped down" by a transformer station from which 13,000 volts is carried to Bishop, where another transformer station sends on

2300 volts to Squire and beyond. The defendant company owns practically all of the land surrounding Bishop and the Appalachian Power Company rents its rights-of-way, transformer station sites, etc., in that immediate vicinity from the defendant. All of the equipment for the transmission of electric power between Bishop and Squire, including the transformer station at Bishop, is owned by the Appalachian Electric Power Company.

On the evening of March 4, 1934, a storeroom owned by Charles Schrader on the right side of the dirt road leading from Squire to Bishop and not far from the town of Squire was destroyed by fire. Two transmission lines, each carrying 2300 volts, ran across the front of and just above the frame building, which fronted upon the highway. A few feet further in the direction of Bishop and slightly further back from the road, was a garage in which Mr. Schrader kept a truck, and still a little further toward Bishop was the Schrader home. Fire in the old store building seems to have gotten fairly well under way before it was noticed. When it was noticed, a congregation of people, numbering probably between 75 and 125, quickly gathered and many of them assisted in attempting to put out the fire and in preventing the nearby garage from taking fire.

In a little while, the transmission lines above the store building were burned through and fell, the ends toward Bishop coming to the ground and those toward Squire falling across the truck which had by then been taken out of the garage and was standing in the road. Neither end of the lines seems to have done any harm at the time that they fell. Shortly thereafter, plaintiff's decedent, with two other boys, drove up from War to Squire and, noticing the fire by the light in the sky, continued toward Bishop to investigate. Coming to the place of the fire, plaintiff's decedent got out of the automobile and began helping to take muddy water from the ditch which was across the road from the fire for the purpose of throwing it upon the fire and garage. He had been so engaged only a short while when he was heard to call out and immediately thereafter was seen entangled in one of

the wires toward Bishop which he had grasped near the end and which was wrapped around one of his legs. In an effort to extricate plaintiff's decedent from the wire, Schrader himself was shocked into insensibility. Thereafter, Carl Pruitt took a dry coat and a jacket and pulled the wire away. Craft, plaintiff's decedent, did not respond to efforts to resuscitate him.

The proof tends to establish that at the time the two wires parted and fell, the lights in the houses in the direction of Bishop, as well as those in the direction of Squire, from the place that the lines parted, went out, and that the ends of the lines toward Bishop lay in the wet and muddy road for something like fifteen minutes or longer before Craft became entangled in them, without any indication that they carried a deadly current. Between the time that the lines fell and the electrocution of Craft, many persons had passed over the ends of the fallen lines toward Bishop without suffering harm, although the evidence does not show that any other person actually came in contact with the wires. About the time that Craft became entangled in the wires, the lights toward Bishop came on dimly for a short time, and after Craft was electrocuted and the wires had been thrown over into the road out of the way, they were seen to flare and sparkle for some little time, indicating that then they carried current. After a time this ceased. Warnings had been shouted from the top of the garage by Mr. Pruitt, certainly after Craft was electrocuted and perhaps before, although there is no proof that Craft was in position at any time where he must have heard such warning. There was considerable excitement owing to the fire, and apparently a good deal of confusion.

While these events were taking place at and around the fire in the Schrader store, at Bishop some three miles away, other things were happening which, in our opinion, can be stated from the plaintiff's viewpoint as follows: The lights at Bishop went out some little time after the fire at Schrader's store began. This, of course, attracted the attention of a number of people at Bishop, among them, F. M. Shumate, the outside foreman and assistant

superintendent of the defendant company. Shumate came out of his home and within a few minutes met J. R. McCutcheon, in charge of defendant's lamp house at Bishop, Shumate at the time having gotten into his car and being headed toward Squire. At this time, there was a decided light in the sky in the direction of Squire, some of the witnesses testifying that they believed that the fire was at the tipple at Bishop, which was in the direction of Squire from where they were. After sending McCutcheon for Hall, the chief electrician of the defendant, with directions to send Hall to see what was wrong at the transformer at Bishop, Shumate continued toward Squire to find out what the trouble was. McCutcheon found Hall, and together, they went to the defendant's lamp house where they procured electric cap lights and a fuse wire. Hall had a key to the enclosure around the transformer. They unlocked the gate, went to the transformer, and there found that the fuse which controlled the current on the lines to Squire had been blown out. After pulling the switch, Hall replaced the fuse, and then threw in the switch, turning the current back into the lines from Bishop towards Squire.

After McCutcheon and Hall had left the transformer house, locking the gate, they went out and crossed the bridge to go back to Bishop. At the bridge, they met Shumate, who had returned from the direction of Squire, who told them that they had better go back and pull out again the switch on the lines towards Squire because two men had just been killed by the current. It does not appear how far towards Squire Shumate had traveled, but he evidently had been told of the accident and evidently had discovered that the trouble lay in the fire at Schrader's store. He must have returned quickly because he did not know when he got back to Bishop that Schrader had revived. McCutcheon and Hall returned and pulled out the switch, and thereafter, Shumate went down to the Schrader store and there cut off the ends of the wires towards Bishop so that they would be out of the way.

It is the plaintiff's theory that when the lines parted at the Schrader store, their grounding caused the fuse at

the transformer at Bishop to blow out, taking the current off the lines from Bishop to Squire, and rendering the grounded wires harmless; that the fact of the blown out fuse indicated a ground or other trouble on the lines from Bishop to Squire and that the unusual and unmistakable lighting in the sky from the fire at Schrader's store was sufficient to indicate that the trouble had its origin at a fire at least in that general direction, and that with these indications of the trouble and its origin, it was negligence to restore the fuse and put the current back into the lines without investigating the trouble and guarding against the danger to others that would result from that course of conduct. Plaintiff contends that the electric lines at Schrader's store lay grounded in the mud and harmless until the fuse was replaced and the power put back into the lines by throwing the switch back into contact at Bishop, and that shortly thereafter, plaintiff's decedent met his death by coming in contact with the charged lines at Schrader's store.

The defendant undertook to show by witnesses that the blowing of the fuse at Bishop was a circumstance which did not indicate trouble. We do not regard it as necessary to go into the details of the testimony on this question because we think that there is ample ground in the testimony for the jury to have reached a conclusion opposite to the defendant's contention. Defendant's principal witness on this matter compared the fuse to a safety plug in a steam boiler.

The defendant also contended that the light in the sky towards Squire was not indicative of the source and location of the trouble that had caused the blowing out of the fuse. Here, too, we think that there is sufficient testimony to have justified the jury in reaching a conclusion opposite to the defendant's contention, notably the fact that F. M. Shumate, at the time that he sent Morris Hall and McCutcheon to the transformer at Bishop, continued in his automobile and went on towards Squire for the purpose of finding out what the trouble was.

Counsel for the defendant in error, with no little plausibility, argue that by comparing the time of restor-

ing the fuse and putting the current back into the lines at Bishop with the established time of Craft's electrocution it cannot be made to appear from the evidence that the accident followed the restoration of the current to the lines, and that to the contrary, it does appear that Craft came to his death before the time that the current was restored to the lines by replacing the fuse at Bishop. Had the jury reached such a conclusion and had they so indicated by their general verdict or in response to a special interrogatory, it is likely that calculations from the evidence could be made which would sustain a finding on this point in favor of the defendant. Too, calculations could be made from the evidence showing that the time of Craft's electrocution coincided with the replacement of the fuse. Therefore, from the state of the record before us, we cannot find that any of the testimony relating to the times at which the main events preceding the electrocution of Craft took place are fixed with sufficient certainty to overthrow a jury finding against the contention of the defendant. There was disturbance and more or less excitement at Bishop; at Schrader's store, there was a fire and stark tragedy. Under the circumstances, the lapse of time between events naturally could be estimated only, and the weight to be attached to the various estimates of the witnesses was a matter, we think, for the jury. We find no certain reason for overthrowing the jury's conclusion on this point.

We think there is no need to refer to the innumerable cases which place upon those responsible for the handling of electricity of deadly potentialities an extremely high degree of care. Under the circumstances of this case, we are of the opinion that the jury was warranted in finding that the blowing out of the fuse at Bishop was sufficient to warn of trouble, and perhaps danger to others, on the lines between Bishop and Squire, and that the light in the sky, admittedly known to Shumate when he instructed McCutcheon to have Hall repair the trouble at the transformer and known as well to Hall and McCutcheon when they carried out Shumate's instructions, was sufficient to give warning of the unusual source of

the trouble and to require, in the exercise of a high degree of care, an investigation before the current was thrown back into the disabled lines. The finding of the jury in favor of the plaintiff was, of course, a finding of actionable negligence, and that finding we believe we would not be warranted in disturbing.

We do not wish to be understood as holding that the replacing of a blown out fuse and the restoring of current to an electric line without precautionary investigation is in all instances actionable negligence. We simply say that considering the deadliness of the current involved, the glare in the sky that was seen by Shumate, Hall and McCutcheon in the direction that the power lines ran upon the public road toward Squire after the fuse was blown and before it was replaced, the inference that could be drawn to the effect that Shumate, before the fuse was replaced, had started toward Squire to investigate the glare in the sky as possibly furnishing information as to the cause of the trouble at the transformer station, and all of the other circumstances of the case before us, we are of the opinion that this jury was warranted in so finding.

The defendant argues that because Craft was first seen with the wire grasped in his hands and because warnings were shouted, probably before he got entangled in the wire, the proof shows that he was guilty of contributory negligence as a matter of law. We have already stated that the evidence fails to show that warnings were brought home to Craft. As to the fact of his having grasped the wires, there is nothing to show but that he may have do so after he came into contact with them in some other way. No one seems to have seen him when he first touched, or was touched by, the wires. We do not think that the proof justifies a finding of contributory negligence as a matter of law.

Having determined that the jury was warranted in its conclusion that there was actionable negligence shown by the proof, and that it was not necessary for it to find contributory negligence, the next inquiry is whether, under the evidence, the jury was warranted in charging

negligence to the defendant, Pocahontas Corporation. Shumate, the outside foreman and assistant superintendent, Hall, the electrician, and McCutcheon in charge of the lamp house, were regularly paid employees of the defendant. Shumate was on a regular monthly salary and Hall and McCutcheon were paid by the day. Defendant was interested in the uninterrupted transmission of power beyond the transformer at Bishop and to its operations there in order that its pumps, fans and other machinery might be kept in continuous use. It was necessary to have some person or persons available for immediate service in the event trouble developed in the transformer station at Bishop, and in order to dispense with the necessity of paying someone for this continuous service, it was customary for the employees of various coal companies operating at the points where transformer stations were located to look after the transformer stations. Through this sort of an arrangement, Shumate, Hall and McCutcheon performed the duties of looking after the transformer station at Bishop and were supplied by the power company with keys to the gate of the enclosure around it. The power company paid them nothing up to the time of the accident resulting in Craft's death; since that time, they have been placed upon the payroll of the power company at either fifty cents or one dollar a month each. Shumate had been acting in this capacity since about 1925. As assistant superintendent, he is a vice-principal of the defendant coal company, though it is contended that in entering upon these duties with respect to the transformer station at Bishop, he acted solely on his own responsibility. He testified that he did not know for whom he was acting, and when pressed, stated that it might have been for both the power company and the coal company.

In determining whose employee a certain person was in the doing of a certain act, where more than one possible employer is involved in the solution of the question, there are many difficulties to be encountered. The question of pay is not conclusive. *Moore, Admx.,* v. *Southern Railway Co.,* 163 N. C. 439, 81 S. E. 603, 51 L. R. A.

(N. S.) 866; *Miller* v. *Minn. and Northwestern Ry. Co.*, 76 Iowa 655, 39 N. W. 188, 14 Am. St. Rep. 258; *Standard Oil Co.* v. *Anderson*, 212 U. S. 215, 29 S. Ct. 252, 53 L. Ed. 480. Here all three men, Shumate, Hall and McCutcheon, were in the pay of the Pocahontas Corporation. They were paid nothing by the Appalachian Electric Power Company. Neither is it necessarily conclusive to determine to whose benefit the act complained of inured. *Higgins* v. *Western Union Telegraph Co.*, 156 N. Y. 75, 50 N. E. 500, 66 Am. St. Rep. 537; *Wyllie* v. *Palmer*, 137 N. Y. 248, 33 N. E. 381, 19 L. R. A. 285. We believe that in this case, the jury could well have determined that the restoration of the fuse and the throwing back in of the switch at Bishop inured to the benefit both of the defendant company and the Appalachian Electric Power Company, because each had an interest in preserving, uninterrupted, the distribution of electric current through the transformer. Neither is the power to employ and discharge the particular employee a conclusive test. *Standard Oil Co.* v. *Anderson*, 212 U. S. 215, 29 S. Ct. 252, 53 L. Ed. 480; *Ziegler* v. *Danbury & Norwalk R. R. Co.*, 52 Conn. 543, 2 A. 462; *Tierney* v. *Syracuse, B. & N. Y. R. R. Co.*, 92 Hun. 146, 32 N. Y. S. 627. In this case, undoubtedly the defendant company had the power to discharge from its employment all three men whose acts are involved, and it is at least a fair inference, we think, from the proof that such a discharge would have terminated their right and duty to attend to the transformer. The testimony shows that the Appalachian Electric Power Company had the right to deprive them of their key to the enclosure of the transformer station. This, also, would have deprived them of their right and duty to look after the transformer. But the ultimate test in determining questions such as this seems to be which employer had the right to control and direct the conduct of the employee in the performance of the act in question. *Standard Oil Co.* v. *Anderson*, 212 U. S. 215, 29 S. Ct. 252, 53 L. Ed. 480; *Higgins* v. *Western Union Telegraph Co.*, 156 N. Y. 75, 50 N. E. 500, 66 Am. St. Rep. 536; *Harding* v. *St. Louis*

*Nat. Stock Yards,* 242 Ill. 244, 90 N. E. 205. See *Gunnoe* v. *W. Va. Poultry Co-op. Asso.,* 115 W. Va. 87, 174 S. E. 691, 93 A. L. R. 944. It must be confessed that on this particular phase, the record before us is meager in direct evidence. However, there are certain considerations which we believe, if not conclusive, at least would justify a jury finding to the effect that Shumate, Hall and McCutcheon were acting, at the time, as the employees of the defendant, Pocahontas Corporation. This fact does not exclude the idea that they may also have been acting as the employees of the Appalachian Electric Power Company, and that the two companies may have exercised joint control over them at the time. *Moore, Admx.,* v. *Southern Ry. Co.,* 163 N. C. 439, 81 S. E. 603, 51 L. R. A. (N. S.) 866, and note; *Postal Telegraph & Cable Co.* v. *Doyle,* 123 Fla. 695, 167 So. 358.

To relieve the general employer and to charge the act of the servant to another on the theory that the servant has been loaned by the general employer to such other, who controlled the conduct of the servant in performing the act complained of, the burden is upon him who asserts the change in relationship and if that change is not established, the liability is that of the general employer. *Standard Oil Company* v. *Anderson,* 212 U. S. 215, 225, 29 S. Ct. 252, 53 L. Ed. 480; *Macale* v. *Lynch,* 110 Wash. 144, 188 P. 517, 518.

It is to be remembered that Shumate was an assistant superintendent and vice-principal of the defendant, Pocahontas Corporation. He it was who gave the order through McCutcheon to Hall that caused Hall, the electrician of the defendant, to go to the transformer station for the purpose of correcting the trouble there. Shumate was controlling the movements and conduct of Hall as well as of McCutcheon. The relationship of Shumate to the defendant, Pocahontas Corporation, which was that of vice-principal, gave him a perfect right to do this for and on behalf of the defendant. There is nothing in this record which would justify us in holding that he had the right on behalf of the Appalachian Electric Power Company to direct the movements of the other

two. In the relationship to the coal company, Shumate is clearly shown to have been the superior of the other two. His conduct, therefore, in giving directions to the other two, coincides exactly with the assumption that all three were acting pursuant to their employment by the defendant coal company. If we assume that they were acting for the Appalachian Electric Power Company, then there is no reason to suppose that Shumate had the right to give orders to Hall and McCutcheon. Whatever rights they had to act for and on behalf of the Appalachian Electric Power Company are not shown to have been other than equal rights. It seems to us that, with these circumstances in mind, and realizing the small matters that are often determinative of this sort of controversy, it is not possible for us to say that the jury was clearly wrong in determining that the liability found by their verdict was that of the defendant.

For the reasons which we have stated, we are of the opinion to reverse the judgment of the Circuit Court of McDowell County, to reinstate the verdict of the jury and to render judgment here upon that verdict in favor of the plaintiff. This, we think, makes it unnecessary to deal with the further assignment of error based upon the refusal of the trial court to permit the plaintiff to amend her writ and declaration.

*Reversed and rendered.*