**C. F. LYTLE CO., Inc., et al. v. HANSEN & ROWLAND, Inc.**

No. 11010.

Circuit Court of Appeals, Ninth Circuit.

Oct. 31, 1945.

J. Charles Dennis, U. S. Atty., of Seattle, Wash., and Harry Sager, Asst. U. S. Atty., of Tacoma, Wash., for appellants.

Charles T. Peterson, of Tacoma, Wash., and James L. Conley, of Portland, Ore., for appellee.

Before DENMAN, STEPHENS, and BONE, Circuit Judges.

DENMAN, Circuit Judge.

Appellants and defendants, C. F. Lytle Company, Inc., and Green Construction Company, joint venturers, here appeal from a judgment of the district court, jury being waived, that plaintiff and appellee, Hansen & Rowland, Inc., agents of the Phoenix Indemnity Company and assignee of its claim for insurance premiums, were entitled to judgment in the sum of $16,153.73 plus interest and costs. The claim was for short-rate public liability and property damage insurance premiums covering the period from June 17, 1942, to September 1, 1942. Jurisdiction of the district court was based upon diversity of citizenship, not properly alleged in the petition for removal from the Washington state court but sufficiently appearing in the record.

There are two grounds of appeal. First, it is claimed that the insurance policy as written included only employees of appellants and their associate unit contractors, and hence should have been, but was not, construed to exclude the great bulk of the 1200 workers involved, who are urged to be rather employees of the United States Government. Second, it is claimed that another typewritten policy endorsement restricted policy coverage to operations "performed at, from or in connection with the construction of approximately 155 miles of Alaska highway from Slana, Alaska, to Canadian Line," and the policy hence should have been construed as excluding premium liability for the major portion of the work of the appellants and associated contractors, which the district court found was performed outside the 155 miles of highway specified above.

On May 4, 1942, the appellants entered into a cost-plus fixed-fee engineering-managment contract with the United States Government "to assure the satisfactory completion of a portion of the Alaska highway from a point on the international boundary line between Canada and Alaska to a point near Slana, Alaska, a distance of approximately 155 miles, designated as Section A-1 and A-2, as shown on the 'Plan of Operations' prepared by and on file with the Public Roads Administration." Appellants' functions included various aspects of procurement, coordination, supervision and keeping of records. In return for their services in directing this $8,400,000 project, appellants were to receive reimbursement for their expenditures and a fixed fee of $67,-200.

Pursuant to contract provision, on June 10, 1942, provisional authority was given the appellants by a telegram from the Commissioner of the Public Works Administration to procure public liability and property damage insurance "as * * * necessary to protect the management and construction contractors."

Coverage by binder was effected on June 17, 1942. The policy here in suit was prepared and delivered one month later in the State of Washington, on July 17, 1942. This provided as to premium

" * * * the earned premium shall be computed at a rate of 85% per hundred of remuneration of all named insureds * * *

"The word 'remuneration' shall mean the entire remuneration earned during the Policy period *by all employees of each and every named insured * * *."*

It provided also that

" * * * The Policy shall apply only to operations performed at, from or in connection with all or any part or division of the construction of approximately 155 miles of Alaska Highway from Slana, Alaska, to Canadian Line."

It is clear, and apparently not disputed, that the phrase "all employees" of the premium provision is qualified and limited by the clause providing the policy shall apply only to the construction of certain sections of the Alaska Highway—qualified at least to the extent of narrowing it at least to Alaska Highway employees. In contention here is the status for policy premium purposes of the great bulk of workers on that highway directed by appellants. The position of appellee is that they were in fact and law employees of the appellants. The latter contend these men were, instead, exclusively government employees regarding whom appellants did not need to contract and did not, in fact, contract for insurance.

In interpreting the word "employees" guidance is afforded by investigation into the situation and probable inten-

tion of the parties. The purpose of the policy, as far as appellants were concerned, was their protection against any liability to third persons from the fault of persons on the project attributable to them as employees. This is, for example, evidenced by the authorizing telegram they sought and received which approved such insurance as was "necessary to protect the management and construction contractors."

During preliminary negotiations both parties dealt in general terms with "all operations" in connection with the construction of the specified sections of road. No reason appears nor is any suggested why appellants should have desired to exclude any employee for whose fault they would probably or certainly be held responsible to third persons. Such exclusion was not specifically made, and no reasonable inference here warrants the construction of the policy as failing to accomplish in this regard the protective purpose for which it was sought.

■ The problem of course remains whether the workers whose status is disputed were in fact and law employees for whose fault appellants would be liable. We conclude that in this sense, and so within the policy's meaning, these workers were employees of appellants.

Appellants' contention to the contrary is based substantially upon the following government dealings with the men. Under a permissive clause of the contract, the government, through the Public Roads Administration, made an election to pay the workers directly instead of through the contractors. To do this it was legally necessary to give them civil service status. This arrangement covered all contractor personnel except the contractors themselves and their immediate representatives, approximately fifteen in all.

Such civil service employees had to have their hiring and other changes in status approved, though not initiated, by government representatives. They were paid by government check. Additionally, with respect to disability compensation, social security and overtime, the men were treated as government employees during the coverage period. It was some six months later that this arrangement was abandoned and individual hiring agreements made by the contractors.

Under this arrangement it seems the workers engaged in road construction were in some sense government employees. But we deem it clear, too, that in a very real way they were in fact employees as well of appellants and their associated contractors, so that there was, at the very least, a high probability that appellants would be chargeable with their faults; consequently they were within the risk sought to be covered and covered by the policy.

■ The law generally does not appear in conflict on the principle of loaned servants here involved. A Washington pronouncement is thus set forth in Macale v. Lynch, 110 Wash. 444, 448, 188 P. 517, 518:

"It is, of course, well-settled law that one who is in the general employ and pay of one person may be loaned or hired, by his employer to another, and, when he undertakes to do the work of the other he becomes the servant of such other, to perform the particular transaction. Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480; Olson v. Veness, 105 Wash. 599, 178 P. 822. The controlling facts in these cases, and in all others which support the rule, is [sic] that the person must have been in the exclusive control of the one to whom he is loaned, and, if so, such servant becomes pro hac vice the servant of him to whom the exclusive control so passes * * *."

■ The well established corollary principle that the reservation of the right of employment of the loaned workman is not a decisive factor is recognized in B. & B. Building Materials Co. v. Winston Co., 158 Wash. 130, 134, 135, 290 P. 839, and McHugh v. King County, 14 Wash.2d 441, 445, 128 P.2d 504.

The control and supervision of the civil service employees by appellants and associated contractors, both in practice and under the contract's provisions, were so complete and thorough-going that it seems quite clear the contractors were responsible for the workmen's faults under the rules above set forth. Testimony showed that it was the unit contractors who gave orders and directions generally to the workmen as to the method, manner and means of carrying on the work. No such orders were given by government representatives, who simply prepared the plans and outlined the scope of the operations. When, for example, it was sought to have a bridge constructed, the government's resident engineer would give the instructions, usually in writing, to the project manager, conceded to be an employee of appellants, and the project manager would then delegate the work to the organization of a unit contractor.

Government inspection of the work, of course, was made as in any case of construction for the government by private contractors.

This method of control is plainly a fulfillment of the contract's terms, which makes it appellants' responsibility "to assure the satisfactory completion of the construction" and provide that appellants' general manager "shall have general direction and supervision of the work." Under the contract appellants' project manager is to supervise and control the individual contractors with respect to "the management of their operations, the work performed by them, the furnishing and handling of their equipment, and the supervision of the employment and discharge of their personnel."

In fact, even the government's hiring and discharge powers, so heavily relied upon by appellant, constituted only a rubber stamping of employer-initiated action. The contract makes it appellants' duty to secure the services of unit contractors with ability to obtain the labor necessary to perform the contruction work required. In practice all recruiting was done by the contractors with government approval, and discharges were handled similarly. Such considerations lead to the conclusion that the construction personnel was not erroneously held by the district court to be included in the policy's premium base.

■ However, the district court erred in construing the policy's coverage and so its premium base as including all work done on those parts of the road outside the 155-mile section between Slana, Alaska, and the Canadian border. A policy endorsement, already quoted, specifically limits the policy's coverage to a certain defined part of the highway; no sufficient reason appears for varying the meaning of the endorsement. The district court found that

"* * * the major portion of the work performed by defendants and said contractors under said contract, between June 17th, 1942, and September 1st, 1942, was performed on sections of said highway in Alaska outside of said 155-mile limits."

It appears that this change in assignment was occasioned by the Japanese occupation of the Aleutian Islands, with its resultant threat to our continental security and more immediately to military supply lines to Alaska. Facing this threat, the army deemed it wise to expedite the building of the other and inland section of the road leading to Fairbanks—this route being made relatively safe by its increased distance from the then existent Japanese invasion of North America.

This change of plans, added to the blocking off of the A-1 and A-2 sections by military deployment, caused the principal personnel resources of appellants, as was testified by the government field engineer, to be "diverted to this other job" of construction on the A-4 highway section farther north and inland toward Fairbanks. Only two of the fourteen associated unit contractors, with a total payroll of $90,053.81, of the total payroll of $1,055,214.02 on which the district court based the policy premium, worked on the A-1 and A-2 sections during the coverage period.

It was testified and is not disputed that the work on section A-4 was not directly a part of the A-1 or A-2 section work, and it plainly appears that it was not done in connection with the construction of the latter sections as might have been the case if, for example, it had been done so that A-4 might be used for necessary transmission of A-1 and A-2 supplies.

Thus work done outside the specified sections of road was therefore not within the policy, and the general payrolls covering work done elsewhere cannot properly be used as a part of the premium base.

■ This conclusion is not altered by appellants' assistant office manager's turning in to appellee of wage expenditure statements covering the contractors' entire Alaska personnel payrolls, nor by his certification with regard to each such statement that

"* * * the following is a true and complete statement of all salaries, wages, sums paid for regular time, overtime, piece·work, and all allowances, and also the cash equivalent of all board, lodging, merchandise, store certificates, credits, and any other substitutes for cash, earned by all persons engaged in all operations in Alaska and elsewhere in connection with the construction of 155 miles of Alaska Highway between Slana, Alaska, and Canadian Border employed by the following [list of appellants' and all unit contractors]."

That these were payroll statements of persons engaged in operations "in connection with" the construction of the covered 155 miles of highway is no more than a

conclusion not binding in these circumstances. It is conceded by appellee that the payrolls did cover work done outside the 155-mile limits, and the evidence shows clearly that this work was not in fact done in connection with the covered work, but rather as a war-required substitute for it.

Appellee urges that the government contract ought to be read with the policy, and that the contract, with reference to which the policy is said to have been drawn, specifically grants the government authority to order such a change of work assignment. A sufficient answer to this contention is that at the time of policy negotiations appellee was unaware of the contract's specific provisions and hence could not have bargained with reference to them.

Additionally it may be pointed out that appellants did know of the contract change provision. Therefore, it is reasonable to regard their failure to provide for the possibility of change as purposeful. This view is supported, too, by an examination of the evidence, oral and written, regarding the preliminary negotiations; such examination shows that almost uniformly the highway section limitation was referred to specifically. At the time of these negotiations the change of assignment had not been made, and the insurance could have seemed adequate to then existing needs.

It is, of course, not controlling that risks are no greater in the policy-excluded area. Location limitations on insurance coverage, where definite, must be given due effect; to hold otherwise would be to create liability on insurance never written. Such spatial narrowings of coverage may, as here, be invoked to protect the insured against premium exactions, (cf. Travelers' Insurance Co. v. Rooney, 95 Vt. 109, 112 A. 355, 356; Maryland Casualty Company v. Little Rock Railway Co., 92 Ark. 306, 122 S.W. 994, 995) or to limit the insurer's responsibility. Pettit v. Reges, 242 N.Y. 272, 151 N.E. 450, 451; Astrin v. East New York Woodwork Co., 210 App.Div. 720, 206 N.Y.S. 524, 526.

It is not necessary that the exact reason for the limitation appear; but here one may readily be inferred. Appellants, operating under a cost-plus fixed-fee contract, were to be reimbursed for necessary and approved expenses incurred. Their profit on an eight million dollar project was limited to the relatively small sum of $67,200. Thus they could ill afford to run the risk of incurring expenses which might be disallowed; and in any case a duty was owed to keep government expenses at the lowest practicable level.

Both the contract and the telegraphic authorization with regard to insurance provided that such only might be sought as was "necessary" to protect the contractors or government. This required careful judgment as to necessity, with a possible severe penalty for undue laxity. Appellants may have concluded that relatively comprehensive coverage of the type secured would be appropriate and necessary as to construction on the 155 miles of construction then planned, but that in other parts of thinly-settled Alaska, where under the contract construction might be required of the contractors, the same expensive quantum of protection would perhaps not be needed.

As a matter of fact the evidence shows that a later policy of another company, written to replace the one in suit and to fit conditions prevailing after the change in work location had been made, omitted property damage coverage except as to that caused by automobiles. Computations of a Phoenix Indemnity Company official indicate that such omitted coverage was the basis for virtually half the premium charge here sought.

Whether or not the reason be the one suggested, the policy does limit coverage to a specific area. The judgment of the district court awarding the full premium claimed must be reversed. An issue appears to be presented as to whether some part of that section of the payroll representing wages of workers traveling to Alaska prior to assignment comes within the premium base. The cause will be remanded for the taking of such evidence on this or other issues as may be necessary for the entry of a judgment for premiums due in conformity with the views herein expressed as to the policy's coverage limitation.

Reversed and remanded.