PEOPLES SUPPLY, Inc., et al., Plaintiffs,

v.

VOGEL-RITT OF PENN-MAR-VA., Inc.,
a corporation, Defendant.

Civ. A. No. 213-M.

United States District Court
N. D. West Virginia,
Martinsburg Division.

Dec. 19, 1958.

James M. Mason, III, Charles Town, W. Va., Clarence E. Martin, Jr., Martinsburg, W. Va., for plaintiffs.

J. Sloan Kuykendall, Thomas V. Monahan, Winchester, Va., D. H. Rodgers, Jr., Martinsburg, W. Va., for defendant.

BOREMAN, District Judge.

This action was instituted in the Circuit Court of Jefferson County, West Virginia, by Peoples Supply, Inc., a West Virginia corporation, against Vogel-Ritt of Penn-Mar-Va., Inc., a Maryland corporation, based on alleged negligence resulting in the destruction by fire of the plaintiff's flour mill. On motion of the defendant, the case was removed to this court on the ground of diversity of citizenship.

As a result of its loss due to the fire, Peoples Supply was indemnified in part by American Central Insurance Co., a Missouri corporation, Camden Fire Insurance Assn., a New Jersey corporation, Fidelity-Phenix Insurance Co., a New York corporation, Insurance Company of North America, a Pennsylvania corporation, and The Millers Mutual Fire Insurance Co., a Pennsylvania corporation, all of which were subsequently joined as plaintiffs, real parties in interest.

By agreement, the case was tried to the Court in lieu of a jury, and the parties stipulated that the damages suffered by the plaintiffs as a result of the fire amounted to $225,000.

The defendant is a corporation engaged in the business of pest control and extermination. On April 23, 1957, the defendant by written contract undertook, for a valuable consideration, to fumigate certain buildings owned by Peoples Supply in Charles Town, West Virginia. These buildings had been used for many years by Peoples Supply and others in the operation of a grain, feed and flour processing, milling and manufacturing business.

In order to minimize the expense of the fumigation service, Peoples Supply agreed to furnish two of its own employees to assist the defendant in preparing the buildings for fumigation. The defendant had furnished this service to Peoples Supply on several prior occasions and had always, under the same arrangement, been so assisted by general employees of Peoples Supply in the preparation of the buildings.

On May 17, 1957, between 8:30 and 8:45 A.M., Paul May and Clarence Cromer, two employees of the defendant, arrived on the premises of the plaintiff, Peoples Supply, for the purpose of preparing the flour mill and warehouse for fumigation. To prepare the buildings for fumigation, it was necessary to seal the windows, doors and other cracks and outlets to prevent the escape of a deadly gas, called methane, which was to be released inside the sealed buildings. The sealing process is accomplished by spreading a type of petroleum jelly or petrolatum, called "protopet", on newspapers, tearing the papers thus treated into strips of various sizes, and placing them around windows and doors and over the cracks and outlets found in the walls of the buildings.

In accordance with the agreement between the parties, the Mill Superintendent of Peoples Supply, Ernest Hahn, ordered two Peoples Supply employees, James Whittington and Clarence Robinson, to assist the defendant's employees in sealing the buildings. Thereupon, Robinson joined May and Cromer on the second floor of the flour mill building.

Since the protopet was cold and stiff, and therefore difficult to spread, the Vogel-Ritt employees suggested that it would spread more easily if it were heated; whereupon Robinson, one of the Peoples Supply employees, picked up an

eight or ten quart bucket about two-thirds full of protopet and carried it to the "bleaching room". In the bleaching room there was an electric space heater upon which, after turning the heater switch to "High", Robinson placed the bucket. At the time, the bucket had a coating of protopet on its outside surface, which had accumulated therefrom prior usage.

After placing the bucket on the heater, Robinson walked past Cromer, told him where the bucket was, and proceeded to the third floor of the mill to begin work. Cromer went to the bleaching room to check on the bucket's location and then returned to the room where he was engaged in spreading the newspapers with protopet. After Robinson had left for the third floor, Whittington, the other Peoples Supply employee, arrived at the second floor, set up a work bench, and began to spread protopet on the newspapers. As they worked, Cromer faced the bleaching room and Whittington faced Cromer with his back to the bleaching room. About ten to fifteen minutes after Whittington began work, Cromer noticed smoke coming from the vicinity of the bleaching room, whereupon he, followed by Whittington, ran to the bleacher room and looked in. Both men saw that the room was afire and gave the alarm. Thereupon, all four of the workers evacuated the building. Whittington returned with a fire extinguisher, but was unsuccessful in his attempts to subdue the fire and, in spite of the efforts of the local fire department, the building burned to the ground.

The plaintiffs' theories of recovery are based upon the following contentions: (1) that the fire was caused by the protopet being placed on the heater; (2) that Robinson and Whittington became special employees of Vogel-Ritt under the loaned-servant doctrine; (3) that the fire was a result of negligence on the part of Robinson, May and Cromer, in allowing the protopet to become overheated on the heater; (4) that if Robinson did not become the special servant of the defendant, there was no actionable negligence on the part of Robinson, but that his action was the result of negligence on the part of May and Cromer in prompting Robinson to put the bucket on the heater; and (5) that if Robinson remained the servant of Peoples Supply, Robinson was not contributorily negligent, because he could not reasonably have anticipated Cromer's failure to tend the bucket of protopet, and because the proximate character of Robinson's contribution, if any, to the fire was broken by Cromer's assuming full control over the heater and the bucket of protopet.

On the other hand, the defendant urges the following: (1) that the protopet did not cause the fire; (2) that if the protopet did cause the fire, it was the negligence of Robinson which was responsible; (3) that Robinson did not become the special employee of the defendant, but remained the employee of Peoples Supply; and (4) that the omission of Cromer to watch the bucket of protopet did not constitute actionable negligence.

Much testimony and argument were offered by both sides bearing on the initial question as to whether the protopet was, or could have been, the actual cause of the fire. The characteristics of both protopet and the electric heater were inquired into at great lengths, and the results of a number of experiments were introduced. However, in view of the Court's findings and conclusions, this question of whether protopet was the guilty offender is, for the purposes of this decision, purely academic and need not be conclusively decided. But the Court will, for the purpose of inquiring into the other questions presented, assume that the protopet, being heated as stated, was the direct cause of the fire and the plaintiffs' losses, which assumption will be considered as fact throughout the remainder of this opinion.

The first and most important consideration is as to whether Robinson and Whittington, the general employees of Peoples Supply, became the special employees of the defendant under the

loaned-servant doctrine for the purpose of the particular job of sealing the flour mill.

■ As stated in 44 W.Va.L.Q. 75 (1937), "The rule is well established that a general servant may be lent or hired by his master to another party for some special purpose so as to become, as to that service, the servant of the other". Standard Oil Co. v. Anderson, 1909, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480; American Tel. & Tel. Co. v. Ohio Valley Sand Co., 1948, 131 W.Va. 736, 50 S.E.2d 884; Craft v. Pocahontas Corp., 1937, 118 W.Va. 380, 190 S.E. 687; Malisfski v. Indemnity Ins. Co., 4 Cir., 1943, 135 F.2d 910. However, there is a presumption in such cases that the general employer was the sole employer of the employee, and the burden of proof is upon him who asserts the change in relationship. American Tel. & Tel. Co. v. Ohio Valley Sand Co., Craft v. Pocahontas Corp., supra.

■ There are many circumstances and indicia that are often considered in determining whether the relationship has been thus changed, but the ultimate test in such a determination is which employer had the right to control and direct the conduct of the employee in the performance of the act in question. Craft v. Pocahontas Corp., supra. In determining who has the right to direct and control the employee, the Court must distinguish between authoritative directions and control and mere suggestion as to the details or the necessary cooperation. Denton v. Yazoo & M. V. R. Co., 1932, 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310; Malisfski v. Indemnity Ins. Co., supra.

The following statement by Mr. Justice Holmes, which was quoted with approval in the landmark case of Standard Oil Co. v. Anderson, supra, 212 U.S. at page 226, 29 S.Ct. at page 256, is considered by the Court to be particularly pertinent to the instant case:

"But the mere fact that a servant is sent to do work pointed out to him by a person who has made a bargain with his master does not make him that person's servant; more than

that is necessary to take him out of the relation established by the only contract which he has made, and to make him a voluntary subject of a new sovereign,—as the master sometimes was called in the old books." See also Maryland Cas. Co. v. Pacific Employers Ins. Co., 10 Cir., 1955, 227 F.2d 485; Kelley v. Summers, 10 Cir., 1954, 210 F.2d 665.

The rule laid down in the Standard Oil case, supra, is more fully explained in the following quotation from 44 W.Va. L.Q. 75, 76 (1937):

"It is not sufficient, in order to relieve the general master of liability, that the servant is partially under the control of the third person, but the new relation must carry with it full and exclusive control, leaving the general master without right to interfere." See also Malisfski v. Indemnity Ins. Co., supra; C. F. Lytle Co. v. Hansen & Rowland, Inc., 9 Cir., 1945, 151 F.2d 573.

It is to be noted that the Supreme Court of West Virginia is in accord with and follows the rules laid down in the Standard Oil case. See American Tel. & Tel. Co. v. Ohio Valley Sand Co., supra, 131 W.Va. at page 740, 50 S.E.2d at page 886; Craft v. Pocahontas Corp., supra, 118 W.Va. at page 390, 190 S.E. at page 692.

■ In view of the above cited authorities, the Court is of the opinion that the plaintiffs have failed to sustain the burden of proof that either Robinson or Whittington became the servant of the defendant, Vogel-Ritt, under the loaned-servant doctrine, so as to make the defendant responsible for his acts. Some of the facts and circumstances which the Court has used as indicia in making this determination are as follows: (1) the employees in question were paid by Peoples Supply; (2) the defendant had no power to discharge or replace the employees; (3) the defendant had no right to give the employees commands, but only the right to point out what was to be done and how to accomplish it (no authoritative control); (4) the job being

done was for the mutual benefit of plaintiff, Peoples Supply, and defendant; (5) Peoples Supply, the general employer, was receiving a direct financial benefit from the fact that the employees were assisting the defendant, in that the cost of the defendant's service would have been higher had the employees not been furnished; and (6) in past years, under the same arrangement, Peoples Supply had felt at liberty to call, and had called, the loaned employees away from the sealing operation to perform other duties for the exclusive benefit of the general employer.

Under the above findings, "the most that can be said on the subject of control is that there was divided authority and this falls short of that power to command which is the necessary element in the determination of a surrender of complete control by the general employer to the temporary employer under the loaned servant doctrine." Aluminum Co. of America v. Ward, 6 Cir., 1956, 231 F.2d 376, 380. See also Kerns v. United States, 4 Cir., 1953, 204 F.2d 813.

It therefore naturally follows that the defendant, Vogel-Ritt, cannot be held liable for any negligence or carelessness on the part of either Robinson or Whittington, they being the servants of the plaintiff, Peoples Supply, exclusively.

Next to be considered is the plaintiff's contention that May and Cromer, the servants of the defendant, or either of them, were or was actionably negligent in certain particulars. In this regard, it is undisputed that these employees of the defendant made the suggestion that the protopet should be heated. It is also undisputed that Cromer knew where the bucket was and that he did not maintain a continuous watch over it. Had it not been for either one of these circumstances, the fire possibly would not have occurred.

■■ An elementary and basic part of the law of negligence is that to constitute actionable negligence, the act or omission complained of must have been the proximate cause of the damage or injury. Puffer v. Hub Cigar Store, 1954, 140 W.Va. 327, 84 S.E.2d 145; Matthews v. Cumberland & Allegheny Gas Co., 1953, 138 W.Va. 639, 77 S.E.2d 180; State ex rel. Cox v. Sims, 1953, 138 W.Va. 482, 77 S.E.2d 151. The proximate cause of an event is that cause which in actual sequence, unbroken by any independent cause, produces the event *and without which* the event would not have occurred. Matthews v. Cumberland & Allegheny Gas Co., supra; Webb v. Sessler, 1950, 135 W.Va. 341, 63 S.E.2d 65; Anderson v. Baltimore & O. R. Co., 1914, 74 W.Va. 17, 81 S.E. 579, 51 L.R.A.,N.S., 888. The fact that the loss would not have occurred *but for* the act or omission complained of is not sufficient. As stated in 65 C.J.S. Negligence § 106 (1950), "In order to impose liability, the negligence charged must be the causa causans, or the cause which produced the injury for which recovery is sought, and not merely the causa sine qua non". This distinction is directly made in a relatively recent West Virginia case, wherein it was held that the fact that the loss would not have occurred without the act or omission complained of is not sufficient to make the particular act or omission the proximate cause, but that the act or omission must have been the cause which actually *produced* the event. Reese v. Lowry, 1955, 140 W. Va. 772, 86 S.E.2d 381.

■ Applying these principles to the facts of the instant case, the Court must conclude that neither the act of suggesting the protopet be heated nor the omission of Cromer to guard the bucket was the proximate cause of the fire in the mill. Although either of these circumstances may have been a causa sine qua non, the causa causans was clearly the act of placing the bucket on the heater and turning the heater to "High". See 65 C.J.S. Negligence § 107 (1950), wherein it is said that where the negligence of one person is merely passive, while the negligence of another is the moving and effective cause

of the injury, the latter is the proximate cause and fixes the liability.

The Court, therefore, accordingly finds the defendant not guilty of any actionable negligence for which it can be held liable.

In order to construct a logical and cohesive discussion of the facts and the law of this case, the Court has refrained from strictly disuniting the two elements of the case. The foregoing will be considered as containing the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

In view of the above findings and conclusions, counsel for the defendant will promptly prepare and submit an appropriate order.